1  WO

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                        **DISTRICT OF ARIZONA**

8

9

10  Defenders of Wildlife, et al,                    )
                                                     )          CV 08-280 TUC DCB
11              Plaintiffs,                           )
                                                     )
    v.                                               )
12                                                   )
    United States Fish and Wildlife et al.,          )
13                                                   )
                Defendants.                           )
14  _____         )
                                                     )
15  WildEarth Guardians, et al.,                     )          CV 08-820 PHX DCB
                                                     )
16              Plaintiffs,                           )
                                                     )
17  v.                                               )          **ORDER**
                                                     )
18  United States Fish and Wildlife et al.,          )
                                                     )
19              Defendants.                           )
                                                     )
20  _____         )

21

22          The Plaintiff WildEarth Guardians (Guardians) filed a Motion for Summary

23  Judgment, which is fully briefed.  On May 23, 2011, the Court heard oral argument and

    took the motion under advisement.
24
            The Court finds that USFS has complied with ESA, section 7(a)(1), requirements
25
    to act, in consultation with and with the assistance of USFWS, to utilize its authorities in
26
    furtherance of the ESA by carrying out programs for the conservation of the Mexican
27

28

gray wolf. The Court denies Guardians' Motion for Summary Judgment and enters

Judgment for USFS.

**Overview: Procedural Posture of the Case**

In 1982, the United States Fish and Wildlife Service (USFWS) issued the

Mexican Wolf Recovery Plan.  In 1998 USFWS issued a final rule, pursuant to section

10(j) of the Endangered Species Act (ESA), to reintroduce an experimental population of

Mexican wolves into the Blue Range Wolf Recovery Area (BRWRA).  USFWS oversaw

the recovery plan and reintroduction program for the species without complaint until 2003

when it entered into a Memorandum of Understanding (MOU) with a number of federal,

state, local, and tribal entities, including Defendant USFS, to create the Adaptive

Management Oversight Committee (AMOC).  On April 30, 2005, the AMOC issued a

document entitled the Mexican Wolf  Blue Range Reintroduction Project Adaptive

Management Oversight Committee Standard Operating Procedure 13 (SOP 13), which

was challenged by Plaintiffs, Guardians and Defenders of Wildlife (Defenders), in these

consolidated cases.  In addition to suing USFWS, Guardians also sued the USFS for

failing to confer with USFWS to carry out a program to conserve the Mexican gray wolf.

On December 3, 2009, a Consent Decree was entered between Defenders and the

USFWS.  The USFWS filed a Motion to Dismiss Guardians' claim  against it, which the

Court granted over Guardians' objection. The Court found the Consent Decree "'in short,

. . . provides all of the relief that Guardians seek – the Service is no longer making

decisions pursuant to SOP 13.'"  (Order (Doc. 78) at 3 (quoting USFWS Motion to

Dismiss (Doc. 71) at 5)).  The AMOC agencies, including USFS, are no longer using

SOP 13. *Id.*

The sole remaining claim in the case is between Guardians and the USFS.

According to Guardians, there are two issues.  First, Guardians ask the Court to decide

what ESA, section 7(a)(1) requires of the USFS: 1) whether section 7(a)(1) requires the

USFS to develop and implement its own agency-specific conservation program for the wolf, and if not– then whether section 7(a)(1) requires the USFS to execute USFWS's wolf programs in a manner that significantly furthers the wolf's conservation.  Either way, USFS is in violation of ESA.  (Guardians Reply (Doc. 82) at 1.)

Specifically, Guardians complain that the Mexican gray wolf is a critically endangered subspecies of wolf driven to the edge of extinction because the federal government acts on behalf of domestic livestock operators rather than the wolf.  Since 1998, when USFWS reintroduced the wolf by releasing 98 wolves into the BRWRA, government agencies, including USFS, have paradoxically removed 70 wolves for preying on livestock and reduced wolf population numbers to 42, with only two breeding pairs in the wild, which is below USFWS's original projections for recovery.  (Guardians MSJ (Doc. 79-2) at 2.)

"Despite the fact that conflicts with livestock permitted by the Forest Service to graze the BRWRA are the primary factor driving wolf removals, the Forest Service has not fundamentally altered its role in obstructing wolf recovery and has never consulted with USFWS to develop and implement its own conservation program for the wolf or otherwise utilize its authorities in furtherance of wolf conservation."  *Id.*

Guardians argue that it is not enough that USFWS and the agencies participating in AMOC, including USFS, no longer make decisions pursuant to SOP 13.  The USFS is the primary land manager of the BRWRA and must be compelled to examine how conflicts with its livestock permitting program are derailing the wolf's recovery, then formulate and implement a plan[1] for reducing those consequences.  Guardians charge that

---

[1]Guardians use the terms plan and program interchangeably, but ESA section 7(a)(1) requires agencies like USFS to utilize their authorities in furtherance of the ESA by carrying out programs for the conservation of endangered and threatened species.  16 U.S.C.A.A § 1536(a)(1) (West 2011).  Whereas, USFWS is charged with developing recovery plans for endangered and threatened species, 16 U.S.C.A. § 1533(f) (West 2011).

3

1  "the Forest Service's failure to consult with USFWS in order to develop and implement a

2  conservation program for the Mexican gray wolf is a direct violation of ESA 7(a)(1) and

3  APA 706(1)." *Id.*

4       Even if not required to adopt its own agency-specific conservation program for

5  the wolf, USFS's failure to utilize its authorities in furtherance of Mexican Wolf recovery

6  is a direct violation of its nondiscretionary duty to conserve the species "set forth at ESA

7  § 7(a)(1), and constitutes agency action unlawfully withheld or unreasonably delayed

8  within the meaning of the APA § 706(1)." *Id.* at 1.

9                          **STANDARD OF REVIEW**

10       "The APA does not create subject matter jurisdiction, but it does provide a

11  generic cause of action for people aggrieved by agency action," (Order (Doc. 30) at 2

12  (citing *Califano v. Sanders*, 430 U.S. 99, 107 (1977)), where no other statute provides a

13  private right of action, *id.* at 35 (citing *Coos County Board of County Com'rs v.*

14  *Kempthorne*, 531 F.3d 792, 810 (9th Cir. 2008)), *see also* 5 U.S.C.A. § 702 (West 2011)

15  (providing cause of action for "[a] person suffering legal wrong because of agency action,

16  or adversely affected or aggrieved by agency action within the meaning of a relevant

17  statute").  "The reviewing court shall – [] compel agency action unlawfully withheld or

18  unreasonably delayed." 5 U.S.C.A. § 706(1) (West 2011).  Guardians do not allege a

19  cause of action under § 706(2), which provides: a reviewing court "shall – hold unlawful

20  and set aside agency action, findings, and conclusions found to be – arbitrary, capricious,

21  an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. §

22  706(2)(A)-(C) (West 2011).

23       Guardians ask the Court, pursuant to § 706(1), to compel USFS to consult with

24  USFWS to develop a USFS-agency specific program for the conservation of the Mexican

25  gray wolf and to carry out a program for the conservation of the Mexican gray wolf.  Both

26  duties are nondiscretionary, but involve some discretion on the part of the agency.  In

27

28                                    4

1   such circumstances, courts have found the claim is properly brought under the APA,

2   which imposes on agencies a general duty of timeliness in carrying out a required action.

3   *See e.g., In re American Rivers and Idaho Rivers United,* 372 F.3d 413, 418 (D.C. 2004)

4   (finding obligation to conclude a matter within a reasonable time under the APA)*, but see*

5   *Bennett v. Spear*, 520 U.S. 154, 173 (1997) (finding actions against regulated agencies

6   proceed under ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1)(A), but subsection A

7   conflicts with subsection C, therefore, failure to act claims against the Secretary are

8   limited to being brought pursuant to the APA); *Sierra Club v. Glickman*, 156 F.3d 606,

9   616-617 (5th Cir. 1998) (citizen suit may be brought against regulated government agency

10  to enforce affirmative requirements of section 7(a)(1)), *Rio Grande Silvery Minnow v.*

11  *Bureau of Reclamation*, 601 F.3d 1096, 1106 (10th Cir. 2010) (finding a plaintiff may

12  utilize ESA's citizen suit provision, 16 U.S.C. § 1540(a)(1)(A), to challenge agency

13  failure to undertake consultation in the first instance).[2]

14        "ESA does not contain a standard of review so, generally, the courts apply the

15  standard of review under the Administrative Procedures Act (APA)," (Order (Doc. 58) at

16  3 (denying Motion to Compel)), which is a highly deferential standard of review, *Norton*

17  *v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 64, 66 (2004).  "Plaintiffs

18  must show that the 'agency failed to take a *discrete* agency action that it is *required to*

19  *take*.'" *Id.* at 55, 62-64.  Here, Guardians allege USFS failed to consult, a procedural

20  requirement under section 7(a)(1), and substantively violated the section by failing to

21  conserve the Mexican gray wolf.

22

23

───────────────

24        [2]Under ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1)(A), the Court may enjoin

25  "any person, including any governmental instrumentality or agency . . . , who is alleged to
    be in violation of any provision of [ESA]."  *See* (Guardians' Motion to Compel (Doc. 42) at

26  4 (describing Second Claim of Relief against USFS as brought pursuant to 16 U.S.C. §

27  1540(a)(1)(A)).

28                                              5

Guardians suggest a two prong approach: "[F]irst, whether the Forest Service has undertaken a conservation program for the wolf, and second whether the Forest Service has consulted with USFWS regarding such a program." (Guardians MSJ (Doc. 79-2) at 12.)  This approach originated with the Court in the context of Guardians' Motion to Compel discovery beyond the administrative record when USFS argued it had acted in compliance with section 7(a)(1), both procedurally and substantively, because: "'[C]onsultation with USFWS has been continuous to carry out two 'primary conservation programs' for the Mexican gray wolf: 1) the Mexican wolf recovery plan and 2) the Mexican wolf ESA § 10(j) reintroduction rule. . . .'  Plaintiff argue[d] that both of these are USFWS programs. The USFS submit[ed] that the ESA 'does *not* require federal agencies to independently develop programs to conserve endangered and threatened species. . . . [Instead], [t]he Forest Service and other federal agencies routinely meet their section 7(a)(1) obligations by carrying out programs developed by USFWS in its expert capacity as a wildlife management agency.'" (Order (Doc. 78) at 4 (citing (Notice of filing Administrative Record (Notice AR) (Doc. 65), Exhibit: Cover letter at 1-2)).

The Court reasoned, if ESA section 7(a)(1) requires USFS to develop its own agency-specific conservation program, then its adoption of USFWS's programs will be insufficient as a matter of law, and the Court will compel USFS to immediately confer and consult with USFWS to develop and implement a USFS agency-specific conservation program for the Mexican gray wolf.  *Id.* at 5.

Guardians' Motion for Summary Judgment and USFS's Response continue in this same vein.  USFS argues that section 7(a)(1) does not require USFS to develop its own, separate, independent, wolf conservation program.  (USFS Response (Doc. 80) at 8-12.)  "Should the Court decline to adopt an agency-specific reading of § 7(a)(1) and instead decide that the Forest Service's support of USFWS's conservation programs are

enough to facially satisfy the ESA, [then] Guardians argue that the Forest Service is *still* in violation of § 7(a)(1), as the Forest Service's "support" has not actually furthered the wolf's conservation." (Guardians Reply (Doc. 82) at 7) (emphasis in original).

Under the APA, section 706(1), the Court must determine whether there has been more than an insignificant undertaking by an agency to conserve an endangered species, amounting to total inaction. *Id.* (citing *Pyramid Lake Paiute Tribe of Indians v. United States*, 898 F.2d 1410, 1418-19 (9th Cir. 1990)).

### ESA: SECTION 7(a)(1)[3]

ESA charges: "The Secretary [USFWS][4] shall review other programs administered by [USFWS] and utilize such programs in furtherance of the purposes of [ESA]. *All Federal agencies shall, in consultation with and with the assistance of the [USFWS], utilize their authorities in furtherance of the purposes of [ESA] by carrying out programs for the conservation of endangered species . . ..*

16 U.S.C.A. § 1536(a)(1) (West 2011) (emphasis added). The USFS is a federal action agency governed by the second clause.

An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C.A. § 1532(6) (West 2011). The ESA defines conservation as, "to use and the use of all methods and procedures which are necessary to bring an endangered species or threatened species to the point at

---

[3]Under section 7(a)(2), an agency must, in consultation with USFWS, ensure that "any action authorized, funded, or carried out by such agency" is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the designated critical habitat or species. Consultation pursuant to subsection 2 is conducted pursuant to formal and informal procedures, 16 U.S.C. 1536(b), which do not apply to consultation conducted under subsection 1. (Order (Doc. 58) at 7-8.) It is undisputed that USFS has engaged in consultation with USFWS, pursuant to section 7(a)(2) in respect to its grazing permits.

[4]The Secretary of Interior delegates responsibility for administering the ESA to the USFWS.

which the measures pursuant to this chapter are no longer necessary."  16 U.S.C.A. §

1532(3) (West 2011).

In this case, the USFWS listed the Mexican wolf in the BRWRA as a

nonessential experimental population, subject to release under section 10(j) of the ESA.

Section 10(j) was added to ESA in 1982 to address federal agencies' frustration over political opposition to reintroduction efforts being taken under ESA provisions that protect a species once it is listed as endangered or threatened.  Specifically, ESA requires the Secretary of the Department of Interior to develop and implement recovery plans for the conservation and survival of listed species unless he finds that such a plan will not promote the conservation of a species. 16 U.S.C. § 1533(f). ESA authorizes the Secretary to "live" trap and transplant (reintroduce) rare species, if necessary, to bring an endangered or threatened species to the point at which protection under ESA is no longer necessary. 16 U.S.C. § 1536(a)(1); 16 U.S.C. § 1532(3). Section 10(j) mitigated perceived conflicts with human activity from reintroduction of endangered or threatened species by clarifying and limiting ESA responsibilities incumbent with experimental host experimental populations like the Mexican wolf. *See Wyoming Farm Bureau Federation et al., v. Babbitt*, 199 F.3d1224, 1231-1233 (discussing wolf reintroduction program, ESA, and 10(j) provisions).

Under section 10(j) an "experimental" population is any population authorized by the Secretary for release as an endangered species or a threatened species outside the current range of that species, 16 U.S.C. § 1539(j)(2)(A), . . ."Before authorizing release of any [such] population . . . , the Secretary shall by regulation identify the population and determine, on the basis of the best available information, whether or not such population is essential to the  continued existence of an endangered species or a threatened species." 16 U.S.C. § 1539(j)(B). *An experimental population shall be treated as a threatened species, 16 U.S.C. § 1539(j)(C),and if not essential, the species shall be treated as a species proposed to be listed.*  By statute critical habitat need not be designated, 16 U.S.C. § 1539(j)(C)(ii), and "[b]y regulation, the Secretary can identify experimental populations, determine whether such populations are essential or nonessential, and, consistent with that determination, provide control mechanisms ( *i.e.,* controlled takings) where the Act would not otherwise permit the exercise of such control measures against listed species." *Wyoming Farm Bureau Federation*, 199 F.3d at 1233.

(Order (Doc. 30) at 5-6) (emphasis added).

Congress created a statutory scheme for the Secretary, in this case USFWS, to

promulgate special rules to identify each experimental population and provide a vehicle

for the development of special regulations for each experimental population that will

address the particular needs of that population. *Id.* (citations omitted).  In this case,
USFWS issued the Mexican Wolf Recovery Plan in 1982, the Final Environmental
Impact Statement (FEIS) for the reintroduction of the Mexican wolf on April 3, 1997, and
on January 12, 1998, promulgated the special rule under section 10(j): the Final Rule for
the Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf
in Arizona and New Mexico. *Id.*

The 1982 Mexican Wolf Recovery Plan envisioned reintroduction of the wolf in
areas where it had been driven almost to extinction due in large part to livestock grazing.
"Both the FEIS and the Final Rule were designed with "considerable management
flexibility . . . to reduce potential conflicts between wolves and the activities of
governmental agencies, livestock operators, hunters, and others." *Id.* (citing Final Rule,
63 Fed. Reg. at 1755; FEIS at 2-16).  "Both the FEIS and the Final Rule envisioned
interagency cooperation in the implementation of the wolf reintroduction plan." *Id.*
(citing FEIS at 2-16; Final Rule, 63 Fed. Reg. at 1759-1760.)

## ARGUMENT

**1.**     **Whether the USFS's Failure to Develop and Implement its Own
Conservation Program for the Wolf is a Violation of ESA § 7(a)(1).**

"The Forest Service has readily admitted that it has not utilized its authorities in
furtherance of the purposes of the ESA by developing and implementing its own
conservation program for the Mexican gray wolf."  (Guardians MSJ (Doc. 79-2) at 12.)  It
is undisputed that the USFS has, instead, carried out a conservation program developed
by USFWS.  Guardians argue that "[b]ecause the Forest Service does not have its own
conservation program for the wolf, it necessarily follows that the Forest Service has not
consulted with USFWS regarding this non-existent program." *Id.* at 13.  "This failure to
consult with FWS constitutes an additional substantive[5] violation of ESA." *Id.*  The

---

[5]Agency consultation under section 7(a)(1) is a procedural requirement.

reverse necessarily follows if the Court finds that the duty to conserve can be satisfied by carrying out the conservation program developed by the USFWS, then USFS has procedurally satisfied the duty to consult.

The administrative record supports this conclusion.  The USFS worked with USFWS to reintroduce the Mexican wolf to carry out the Mexican Wolf Recovery Plan. The objectives of the Wolf Recovery Plan were to maintain a captive population and to re-establish a viable, self-sustaining wild population of Mexican wolves.  (USFWS First Supplemental Administrative Record (USFWS 1st Supp. AR), Ex. 16:  Five Year Review at TC-2.)

From the beginning, USFS participated in the reintroduction process, such as locating release pens, public information, and area management after reintroduction. (USFS AR, Exs. 1, 13, 33, 38, 39, 85, 95, 101, 102, 105, 148, 167, 168, 354.)  From the inception of the reintroduction program in 1982 through 2008, USFS was an active participant by putting boots on the ground for the reintroduction of the wolf, *id.*, exs. 34, 59, and cooperating in the interagency management of the wolf reintroduction program, *id.,* exs. 63, 160, and at all times served alongside USFWS as a member of the various interagency management teams designed to further the conservation and recovery of the Mexican wolf, *id.*, exs. 51, 53, 68, 75, 160, 171, 174, 272, 336, 378.

As summarized by Guardians at oral argument, USFS's involvement related to land management for release pen locations and wolf releases, and USFS's membership and participation in the interagency wolf management organization, AMOC.

Guardians admit that there is no Ninth Circuit precedent expressly supporting its interpretation of ESA section 7(a)(1), as requiring an action agency, like USFS, to independently develop and implement its own agency-specific conservation program, but according to Guardians, "the Fifth Circuit has squarely held that the specific conservation obligations of ESA § 7(a)(1) are not only species-specific, but agency-specific as well."

(Guardians MSJ (Doc. 79-2) at 6 (citing *Sierra Club v. Glickman*, 156 F.3d 606, 618 (5th Cir. 1998) (finding ESA § 7(a)(1) required USDA to develop its own conservation program for threatened and endangered species dependant on the Edwards aquifer)). "The Ninth Circuit Court of Appeals assumed without comment in *Pyramid Lake* that Section 7(a)(1) requires non-Interior agencies to develop their own conservation programs." *Id.* at 7 (citing *Pyramid Lake Tribe v. United States Department of the Navy*, 898 F.2d 1410, 1416 (9th Cir. 1990).

Guardians overstate the law. In *Pyramid*, the Pyramid Lake Paiute Tribe (the Tribe) challenged the Navy's practice of outleasing acreage with water rights to local farmers because it depleted the water in Pyramid Lake, which was primary habitat for Cui-ui fish, an endangered species. In *Pyramid*, the USFWS had developed a Cui-ui Restoration Program aimed at increasing the water level of the lake. *Pyramid*, 898 F.2d at 1413

The Tribe argued the Navy violated section 7(a)(2) because it failed to ensure that its actions were not likely to jeopardize the continued existence of the listed species. The court found that the Navy met its procedural obligation to consult with USFWS regarding the outlease program and could rely on the USFWS biological opinion (BO) that the outlease program would not jeopardize the Cui-ui because the Tribe failed to show the BO was arbitrary or capricious. *Id.* at 1415

The court also considered the Navy's obligations under section 7(a)(1). The court rejected the Navy's argument that section 7(a)(1) only required it to "*develop programs that will operate to conserve listed species, . . . in a manner consistent with the accomplishment of the agencies' primary goals.*" *Id.* at 1417. It rejected the Tribe's argument that an agency must adopt the least burdensome alternative because "it would work to divest an agency of virtually all discretion in deciding how to fulfill its duty to conserve," *id.* at 1418, and further found that the alternative proposed by the Tribe was an

insignificant conservation measure, which in the context of ESA is "oxymoronic" to the very definition of conservation, *id.* at 1419.

The court held that action agencies hold equal responsibility with USFWS to utilize their authorities in furtherance of the ESA by carrying out programs for the conservation of endangered species. *Id.* at 1417 n. 15. Discussing the seminal ESA case *Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) (*TVA*), the court noted that *TVA* was premised on section 7(a)(2), not 7(a)(1), and in *TVA* it was indisputable that the challenged agency action would result in total destruction of the endangered species habitat whereas the outlease program had been determined not likely to jeopardize the Cui-ui. *Id.* at 1418. The court found the Navy's outlease program did not substantively violate ESA section 7's conservation requirement.

The Fifth Circuit case, *Glickman*, involved an action against the United States Department of Agriculture (USDA) for violating section 7(a)(1) of the ESA by failing to consult with USFWS and failing to utilize its authorities to carry out programs for the conservation of Edwards-aquifer-dependent species. In *Glickman,* the court rejected the USDA's argument that it had complied with the requirements of 7(a)(1) because Edwards-aquifer dependant species had experienced incidental benefits from USDA programs designed and carried out for other purposes. *Glickman*, 156 F.3d at 618. This finding was necessary for standing: section 7(a)(1) provided redressibility because it was designed to protect a threatened concrete interest, not just a generalized duty to confer and develop programs for the benefit of endangered species. *Id.* at 615. "Congress intended to impose an affirmative duty on each federal agency to conserve each of the species listed pursuant to § 1533." *Id.* at 616. The court refused to allow the USDA to read out of existence ESA's requirement that the agency have a substantive conservation program for the species to be carried out in consultation with USFWS. The USDA did

1   not dispute  that it had never fulfilled any obligations under 7(a)(1) with respect to
2   Edwards-aquifer dependant species.  *Id.*  at 618.

3        Neither *Pyramid* nor *Glickman* support Guardians' position that section 7(a)(1)
4   requires USFS to develop its own independent agency-specific conservation program for
5   the Mexican wolf.  The Court finds that under *Pyramid* and *Glickman*, the USFS has
6   responsibility, equal to that of the USFWS, to use its authorities in furtherance of the
7   conservation of the Mexican gray wolf and has an affirmative duty to carry out a program
8   for the conservation of the Mexican gray wolf.  In other words, USFS must carry out a
9   substantive conservation program for the Mexican gray wolf.  This coincides with the
10  express language of the statute, which is clear and unambiguous.  The statute requires
11  agencies, such as USFS, "in consultation with and with the assistance of the [USFWS], to
12  utilize their authorities in furtherance of the purposes of [ESA] by carrying out programs
13  for the conservation of endangered species and threatened species. . .."  16 U.S.C.A. §
14  1536(a)(1) (West 2011).

15       In *Chevron*, the Supreme Court instructs the courts to conduct statutory review in
16  two steps: "First, always, is the question whether Congress has directly spoken to the
17  precise question at issue. If the intent of Congress is clear, that is the end of the matter;
18  for the court, as well as the agency, must give effect to the unambiguously expressed
19  intent of Congress. If, however, the court determines Congress has not directly spoken to
20  the precise question at issue, the court does not simply impose its own construction on the
21  statute, as would be necessary in the absence of an administrative interpretation. Rather, if
22  the statute is silent or ambiguous with respect to the specific issue, the question for the
23  court is whether the agency's answer is based on a permissible construction of the
24  statute."  *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837,
25  842-43(1984).

26

27

28                                        13

1    Guardians argue that while the statute "at first blush" appears to be "a

2 generalized duty to confer and develop programs for the benefit of endangered species –"

3 (Reply at 5 (quoting *Glickman*,156 F.3d at 615)), ". . . when the ESA is read as a whole,"

4 it is clear the statute requires an "agency-specific approach," *id.* at 6.  The Court does not

5 agree.

6    The Court, reading ESA as a whole, finds that section 10(j) provided for USFWS

7 to designate the Mexican gray wolf in the BRWRA as a nonessential experimental

8 population.[6]  The Court must consider that the purpose of section 10(j) was to mitigate

9 "perceived conflicts with human activity from reintroduction of endangered or threatened

10 species by clarifying and limiting ESA responsibilities incumbent with experimental

11 populations in the hope of encouraging private parties to host experimental populations

12 like the Mexican wolf."  (Order (Doc. 30) at 6 (citing *Wyoming Farm Bureau Federation*

13 *et al., v. Babbit*, 199 F.3d 1224, 1231-1233 (discussing wolf reintroduction program,

14 ESA, and 10(j) provisions)).  The Mexican gray wolf in the BRWRA, designated as a

15 nonessential experimental population (ENE), is treated as a species proposed to be listed;

16 it is purposefully not afforded the same protections as otherwise listed endangered and

17 threatened species.[7]

18

19

---

20    [6]The gray wolf in the majority of the United States is listed as endangered and
21 threatened, except it is listed as experimental nonessential in the BRWRA and Wyoming.
   50 C.F.R. § 17.11.

22

23    [7]This distinguishes the Mexican gray wolf in the BRWRA from the programs and
   protections afforded other species Guardians suggest as comparisons, such as the Canadian
24 lynx and the grizzly bear in Yellowstone National Forest.  (Guardians' Motion to Compel
   (Doc. 63) at 7-10.)  The lynx is designated "threatened." 50 C.F.R. § 17.11.  The grizzly bear
25 is listed as "threatened," except in Idaho and Montana where it is designated experimental
   nonessential.  *Id.*  However, treatment of experimental nonessential species as "proposed to
26 be listed" and the corresponding reduced protections do not apply to such species residing
27 within the National Park System.  50 C.F.R. 17.83(a).

28                                    14

1   Guardians agree that "this fact is a critical one in this case, which makes the

2   USFS's compliance with ESA § 7(a)(1) all the more crucial. This is because the ENE

3   designation *eviscerates* the otherwise protective value of ESA § 7(a)(2) consultations by

4   turning what would be meaningful biological assessments or opinions into "not likely to

5   jeopardize" rubberstamps of the USFS's grazing permits." (Guardians Reply (Doc. 82) at

6   9 (citing MSJ (Doc. 79-1), SOF ¶ 14) (emphasis added). "Unlike ESA §§ 4(a)(3)(A)

7   (critical habitat designation), 7(a)(2) (interagency consultation), and 9(a)(1)(B) (take

8   prohibition), ESA § 7(a)(1) *is not affected* by the ENE designation. (citation omitted);

9   [r]ather, § 7(a)(1) stays intact with full force and effect, and should in this instance be

10  providing some conservation value for the wolf." *Id.* n. 17; *see also* (Guardians MSJ

11  (Doc. 79-2) at 13.) The Court agrees, but considering ESA as a whole, the Court finds

12  that section 7(a)(1) cannot require an action agency to carry out programs for the

13  conservation of the Mexican wolf that would *eviscerate* the section 10(j) ENE listing.

14  Guardians' position that USFS must develop its own Mexican gray wolf

15  conservation program and may not simply implement a program developed by USFWS

16  puts form over substance and is not supported by either *Pyramid* or *Glickman*, or the

17  statute, either section 7(a)(1) or ESA as a whole. The Court finds that Congress has

18  "directly spoken to the precise question at issue" here and requires agencies, like USFS,

19  "to carry out programs for the conservation of endangered species and threatened

20  species," such as the Mexican gray wolf, and to do so "in consultation with and with

21  assistance from USFWS." 16 U.S.C. § 1536(a)(1). Congress requires nothing more and

22  nothing less.

23  Even if the Court concluded that Congress had not answered the question

24  expressly in the statute and turned to the second step outlined in *Chevron*, the Court

25  would find that USFWS's interpretation of ESA, section 7(a)(1), is a permissible one.

26  According to USFWS, "the Act does not mandate particular actions to be taken by

27

28                                                    15

Federal agencies to implement 7(a)(1)." 51 FR at 19934. USFWS recommends particular actions, which the federal agencies are free to implement or not. The agency's interpretation of the ESA is entitled to deference. *Pyramid*, 898 F.2d at 1418, *Chevron,* 467 U.S. at 844. The USFWS's interpretation of the statute makes sense because it would be a waste of resources to require action agencies to "do over" conservation programs developed by USFWS, the lead expert in the conservation of endangered and threatened species. *Cf., San Francisco Baykeeper v. U.S. Army Corps of Engineers*, 219 F.Supp.2d 1001, 1012 (N.D.Cal.,2002) (finding NEPA regulations requiring preparation of Environmental Assessment (EA) allows for acceptable work done by permit applicant; it need not be redone, but must be verified by the agency); *Seattle Audubon Soc. v. Lyons*, 871 F.Supp. 1291, 1318 (W.D.Wash.,1994) (same applies to agency requirement to prepare Environmental Impact Statement (EIS)); *Life of the Land v. Brinegar,* 485 F.2d 460, 467 (9th Cir. 1973) (same).

  This does not mean USFS can simply "rubberstamp" a conservation program developed by USFWS. The USFS is independently responsible for the sufficiency of the USFWS programs it adopts as its own. *See e.g., Florida Key Deer v. Paulison*, 522 F.3d 1133, 1144 (11th Cir. 2008) (applying section 7 to  Federal Emergency Management Agency (FEMA) flood insurance program). The Eleventh Circuit found section 7 placed an affirmative conservation duty on FEMA to conserve the endangered Florida Key deer. *Id.* at 1138. Once FEMA consulted with USFWS regarding the impact of its flood insurance program on the deer, the USFWS recommended "reasonable and prudent alternatives" (RPAs), which included USFWS review of new building permits being issued in Monroe County and "conservation recommendations" for an incentive program to reduce premiums in counties that adopted comprehensive, county-wide habitat conservation plans. FEMA did both. *Id.* at 1139-40. The former satisfied section 7(a)(2)

and the latter addressed 7(a)(1).  Environmentalists challenged both measures.  The

Eleventh Circuit followed the reasoning of the Ninth Circuit as explained in *Pyramid*.

As to section 7(a)(2), the court held that if USFWS's proposed RPA

recommendations were arbitrary and capricious then reliance on them by the action

agency is "like-wise" arbitrary and capricious.  *Id.* at 1145.  The analysis required by

*Pyramid* is whether a challenging party can point to "new" information that USFWS did

not take into account– which challenges the USFWS's recommendations.  *Id.* at 1144

(citing *Pyramid*, 898 F.2d at 1415).  As to section 7(a)(1), FEMA complied with

USFWS's conservation recommendation for an incentive program, but after nine years it

had failed to produce even one county-wide habitat conservation plan.  The incentive

program was undisputably a complete failure.  *Id.* at 1145.  The court found that "the

Ninth Circuit has given substance to the baseline requirement of section 7(a)(1) that

federal agencies actually carry out conservation programs."  *Id.* at 1146.  In other words,

the Ninth Circuit has set a floor for substantively evaluating section 7(a)(1), which is:

"total inaction is not allowed."  *Id.*

At a minimum, agencies "must in fact carry out a program to conserve, and not

an 'insignificant' measure that does not, or is not reasonably likely to, conserve

endangered or threatened species."  *Id.*  The court had "no trouble concluding that

FEMA's program to conserve amounted to the total inaction that other courts have

condemned."  *Id.* at 1147.  The program [] had *no* effect whatsoever despite its long

tenure, and it [was] therefore not a program to conserve."  *Id.*  (emphasis in original).

Therefore, even though the Court has rejected Guardians' argument that section

7(a)(1) requires agency-specific development of a conservation program, it must address

Guardians' argument "that the USFS is *still* in violation of section 7(a)(1), as the Forest

Service's 'support' has not actually furthered the wolf's conservation."  (Guardians'

Reply at 7) (emphasis in original).

1    **2.        Whether the USFS's Support of USFWS's Mexican Wolf Program has**
2          **Hindered the Conservation of the Subspecies.**

3          Under ESA, action agencies have substantial discretion in determining how best
4    to fulfill their section 7(a)(1) obligations.  "'While compliance is not committed to agency
5    discretion, it is clearly beyond [a] court's authority to order that any specific conservation
6    measure be undertaken.'"  (USFS Response at 6 (quoting *DOW v. United States Dep't of*
7    *Interior*, 354 F. Supp. 2d 1156, 1174 (Or. 2005)), *see also, Pyramid Lake*, 898 F.2d at
8    1418, *DOW v. Babbitt*, 130 F. Supp. 2d 121, 135 (D.C. 2001); *Coalition for Sustainable*
9    *Resources v. USFS*, 48 F. Supp. 2d 1303, 1315-16 (Wyo. 1999), *aff'd in part, vacated in*
10   *part on other grounds*, 259 F.3d 1244 (10th Cir. 2001), *Hawksbill Sea Turtle v. FEMA*, 11
11   F. Supp. 2d 529, 542-43 (V.I. 1998), *remanded on other grounds*, 215 F.3d 1314 (3rd Cir.
12   2000); *Strahan v. Linnon*, 967 F. Supp. 581, 596 (Mass. 1997), *aff'd* 187 F. 3d 623 (1st
13   Cir. 1998), *Center for Marine Conservation v. Brown*, 917 F. Supp. 1128, 1150 (Tex.
14   1996), *DOW v. EPA*, 688 F. Supp. 1334, 1352 (Minn. 1988), *aff'd in part rev'd in part on*
15   *other grounds*, 882 F.2d 1294 (8th Cir. 1989).

16          In this failure to act case, the question is whether the actions undertaken by the
17   USFS are so insignificant as to qualify as total inaction.  Where there is total inaction, the
18   courts have "no trouble" finding a violation of section 7(a)(1) because the agency has
19   "impermissibly 'read out of existence' [its] substantive requirement to use the agency's
20   authorities by carrying out programs for the conservation of endangered and threatened
21   species."  *DOW v. Flowers*, 2003 WL 22143271 at *2 (Arizona, August 18, 2003).

22          Guardians allege that the USFS had "for more than a century permitted domestic
23   livestock grazing on federal lands, [which] was instrumental in driving the Mexican wolf
24   to extinction in the wild." (Guardians MSJ (Doc. 79-1), SOF ¶ 2.)  The USFWS began
25   active conservation of the Mexican gray wolf when it trapped the last known remaining

26

27

28                                          18

wild wolves (four males and one pregnant female). *Id.* ¶ 5.  It issued the Wolf Recovery Plan in 1982.  *Id.* ¶ 6.

"FWS believed it needed the management flexibility of ESA § 10(j) in order to successfully recover the Mexican wolf to the Apache and Gila National Forests [BRWRA], where domestic livestock are 'omnipresent' by virtue of the Forest Service's ongoing grazing program."  *Id.* ¶ 10 (citing AR, Ex. 128 at Bates Stamp (BS) 002354; Complaint ¶ 30; Answer ¶ 30 (admission that livestock graze the "vast majority" of the BRWRA); AR, Ex. 128 at BS 002354 (interactions between wolves and cattle on the BRWRA are "unavoidable")).

The USFWS expressly incorporated into the Special Rule[8] for the Mexican gray wolf that it was an ENE and included provisions for dealing with conflicts between its reintroduced wolves and the USFS's permitted livestock.  *Id.* (citing 50 C.F.R. § 17.84(k), AR 54 at BS 001733).  "Specifically, the Special Rule, adopted at 50 C.F.R. § 17.84(k)(3)(ix), authorizes USFWS to lawfully "take" depredating[9] wolves from the ENE population in a manner consistent with a FWS approved management plan, special management measure, or valid FWS issued permit."  *Id.* ¶ 11.

From 1998 to 2002, USFWS was the lead organization, with interagency cooperation and participation by other agencies, such as USFS, as member entities in the 1998 Mexican Wolf Interagency Management Plan (IMP), which provided for an Interagency Management Advisory Group (IMAG).  The USFS's role on IMAG was to provide information on wolf locations to grazing permittees, maintain public relations with newspapers, and approve proposed locations for site-specific USFWS actions, such as wolf release locations.  The USFS also began including wolf analysis in its section

---

[8]The Special Rule codifies the Final Rule for the Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico.

[9]USFWS is authorized to kill wolves that kill livestock.

7(a)(2) biological assessments for proposed grazing permits, but the ENE listing for Mexican wolves on the BRWRA meant that "no proposed agency action" would ever lead to a jeopardy determination for the entire species.  Therefore, there was essentially a blanket "not likely to jeopardize the continued existence of the wolf" biological assessment, pursuant to section 7(a)(2) consultation required under ESA, for every USFS grazing permit.  *Id.* ¶ 14.  During this time the wolf population grew.  *Id.* ¶ 15.

Guardians allege that USFS expressed a desire for more wolf removals and more influence over project management, primarily to protect its livestock grazing permit program.  *Id.* ¶ 15.  In 2003, USFWS caved to pressure, replacing IMAG with AMOC, and turning leadership of the program over to USFS and other agencies.  *Id.* ¶ 16.  AMOC generated several SOPs, including SOP 13, which replaced the IMP and was the subject of the parties' claims in this case against USFWS.  Under the direction of AMOC and pursuant to SOP13, wolf populations declined due to high rates of removal in large part in response to depredation incidents between wolves and livestock.  *Id.* ¶ 17-19.

"Since 2003, the wolf recovery program has been operating essentially as a 'put and take' program, whereby FWS 'puts' wolves out on the landscape and then 'takes' them off again to accommodate the Forest Service's permitted grazing. Instead of working proactively on a program to avoid, or at least mitigate, wolf-livestock conflicts on the BRWRA, the Forest Service has worked only reactively to increase wolf removals through its position on the AMOC. The Forest Service has acknowledged through the AMOC that this 'aggressive removal rate of wolves by management due to depredation...[is] hindering population growth.'" *Id.* ¶20 (quoting AR, Ex. 378 at BS 006177).  "Still, the Forest Service has taken no affirmative steps to work with FWS to address the root of the problem with the wolf recovery project – namely that those agencies in charge of the project have for years consistently prioritized the uninterrupted

implementation of the Forest Service's domestic livestock grazing program over the mandate for Mexican gray wolf conservation." *Id.* ¶ 20.

Guardians do not challenge the sufficiency of USFWS's conservation program from its inception to 2002, but instead complain that during this time USFS's contributions did not add anything to wolf conservation and its lobbying for increased removals was disadvantageous to wolf conservation. *Id.* ¶ 24-27. "Between 1998 and December 2007, wolf-livestock conflict was the leading cause of management removal of wolves . . . At the end of 2007, the lead agencies acknowledged that the aggressive removal rate of wolves by management due to depredation, nuisance, and boundary issues was hindering population growth, although they also reiterated the importance of demonstrating a high level of responsiveness to conflicts." *Id.* ¶ 28 (quoting AR, Ex. 378 at BS 006177).

Guardians' focus on 2003 reflects the creation of AMOC when USFS and others took over as cooperating Lead Agency members responsible for Mexican wolf management in place of USFWS. *Id.* ¶ 28. The AMOC continued to govern the Mexican wolf program pursuant to SOP 13 until November 2009, when USFWS agreed to discontinue it. *Id.* ¶ 29 (citing Consent Decree (Doc. 62)). While the USFWS has disavowed SOP 13, Guardians allege that AMOC continues to protect the USFS's grazing permittees. *Id.* ¶ 30-31.

Guardians specifically charge that "the Forest Service [has failed to] reform[] the way in which it operates its livestock grazing program, mandate[] proactive mitigation measures on those grazing allotments within the BRWRA, close[] any such grazing allotments to livestock, alter[] its support of a punitive, reactive approach to dealing with wolf-livestock conflicts, or consult[] with FWS as to how it might do any of these things or otherwise utilize its authorities in furtherance of Mexican gray wolf conservation." *Id.* ¶ 32.

Guardians Statement of Facts supports USFS's assertion that "'consultation with USFWS has been continuous to carry out two 'primary conservation programs' for the Mexican gray wolf: 1) the Mexican wolf recovery plan and 2) the Mexican wolf ESA § 10(j) reintroduction rule. . . .'" *Supra* at 6 (citations omitted).  Both programs were developed by USFWS, the agency within the Department of Interior authorized by law to protect and manage the fish, wildlife, and native plant resources of the United States.  *See* 16 U.S.C. § 1533(f) (charging the Secretary with developing and implementing recovery plans for the conservation and survival of endangered and threatened species).  There is a strong presumption in favor of upholding decisions by the USFWS in view of its expertise in the area of wildlife conservation and management.  *Carlton v. Babbitt,* 900 F.Supp. 526, 530 (D.D.C.1995), *see also San Francisco Baykeeper*, 219 F. Supp. 2d at 1026 (finding Corp of Engineers could rely on FWS finding of no jeopardy when carrying out its 7(a)(1) duty to conserve listed species).

The conservation program developed by USFWS was premised on the Mexican wolf being designated an experimental nonessential (ENE) species and required interagency cooperation and considerable management flexibility to reduce potential conflicts between wolves and the activities of governmental agencies, livestock operators, hunters, and others.  The ENE designation, interagency-cooperative wolf management, and management flexibility were essential because USFWS was planning on reintroducing the wolf in the "middle of an area fairly densely populated with livestock." (Amicus New Mexico Cattle Growers Assoc (Amicus) Objection at 2-3.)  From the beginning, the plan was to allow grazing to continue and to remove depredating wolves. The Mexican Wolf Recovery Plan, the FEIS, and the Final Rule for Reintroduction of the Mexican Wolf all support this assertion.

Except for SOP 13, Guardians did not challenge the USFWS's recovery plan or reintroduction program.  Guardians only alleged, "FWS's adoption and continued

implementation of SOP 13 does not 'further the conservation' of the Mexican gray wolf subspecies as required by ESA § 10(j), and is thus arbitrary and capricious, contrary to law, in excess of statutory authority, without observance of procedure required by law, and unsupported by substantial evidence under APA § 706(2)(A) and (C) – (E.)." (Complaint CV 08-820 TUC DCB (Doc. 1) ¶ 52.)  Guardians did not raise any other challenges to the USFWS programs.  Guardians' claims against USFS focus on the livestock grazing permit program.

There are examples in the record which reflect the USFS has imposed allotment-specific wolf conservation measures, such as annual grazing permit instructions (AOIs) and allotment management plans (AOPs), to cover such things as "the use of the Whiterocks allotment to address wolf/livestock conflicts on the Deep Creek allotment," (USFS Administrative Record (AR), Ex. 459 at Bates Stamp (BS 6526)), including a pasture rotation schedule to address wolf/livestock interactions on the Deep Creek Allotment, *id.* at BS 6528, and provided for "Special Management Concerns: If the Dark Canyon wolf pack dens on or near the allotment and (sic) affects the planned rotation, pasture scheduling will be adjusted to separate your cattle as much as possible from the denning area.  Use of the Whiterocks Allotment is authorized for the purpose of relieving pressure on your operation from the wolf depredations.  I appreciate your cooperation in making these adjustments to further the wolf recovery program," *id.* at BS 6530.

Additionally, the record reflects that USFS consulted with USFWS as required under section 7(a)(2) before issuing grazing permits in the BRWRA.  Of course this resulted in the "no jeopardy" finding that Guardians challenge as a "rubberstamp" because USFWS routinely confirmed these biological assessments, as follows: "Conflicts can occur between the timing and location of livestock calving and calf depredations (depredation that is other than incidental) by wolves already residing in a specific reintroduction area.  If this situation occurs or is anticipated, it is strongly recommended

1   that Forest personnel and affected livestock permittees, work with the wolf Field Team to

2   arrive at a solution." *Id.*, Exs. 5-12:USFWS consultation letters of concurrence.

3        The administrative record in this case reflects that this is not a case like *Pyramid*

4   where the agency has taken no action whatsoever, and a reviewing court should have no

5   problem in finding total inaction and issuing an order to "compel agency action

6   unlawfully withheld or unreasonably delayed." 5 U.S.C.A. § 706(1). The Court has a

7   problem finding total inaction where USFS has undertaken measures to carry out the

8   unchallenged wolf conservation program developed by USFWS, which allows for

9   livestock grazing on the BRWRA, and has undertaken measures to carry out the grazing

10  permit program in full compliance with section 7(a)(2).

11                              **CONCLUSION**

12       Guardians frame its case as a failure to act claim, but Guardians really argue that

13  USFS's actions have failed to conserve the wolf. In other words, USFS has acted

14  arbitrarily, capriciously, abused its discretion or otherwise not acted in accordance with

15  law. 5 U.S.C. § 706(2)(A). Such a claim requires final agency action for review under

16  the APA, 5 U.S.C. § 704, and the ESA requires a discrete agency action, enforceable

17  under ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1)(A), *SUWA*, 542 U.S. at 66.

18       Guardians' Statement of Facts makes it clear that discrete decisions challenged in

19  this case were in large part not made by USFS. Specifically, USFWS made the ENE

20  designation for the Mexican gray wolf from which flow many of the consequences

21  challenged by Guardians, including the "not likely to jeopardize" biological assessments

22  necessary for USFS to continue issuing grazing permits. Guardians did not challenge the

23  ENE designation. Guardians did not challenge the USFWS's Mexican Wolf Recovery

24  Plan, the FEIS, or the Final Rule for the Reintroduction of the Mexican Gray Wolf, all of

25  which were developed around the ENE designation and provided for continued livestock

26  grazing on USFS land and taking of wolves for depredation of livestock. Guardians

27

28                                      24

admit conservation was carried out successfully while USFWS was in charge of the very program it now asserts is "insignificant."  Guardians has not proved USFS has failed totally to act to conserve the Mexican gray wolf.

**Accordingly,**

**IT IS ORDERED** that the Motion for Summary Judgment (Doc. 79-2) is DENIED.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter Judgment for Defendant.

DATED this 13th day of June, 2011.

David C. Bury
United States District Judge